**CIRCUIT COURT OF MARYLAND
ANNE ARUNDEL COUNTY**

| | |
|---|---|
| **ALEJANDRA JOYNER**<br>**4311 W Forest Park Ave**<br>**Baltimore MD 21207,** | * |
| | * |
| **Plaintiff,** | * |
| **v.** | *  **Case No.** C-02-CV-26-000356 |
| **95 PERCENT GROUP, LLC**<br>**475 Half Day Rd**<br>**Ste 300**<br>**Lincolnshire, IL 60069** | * |
| | *  **JURY TRIAL DEMANDED** |
| | * |
| **Serve On:** | |
| | * |
| **COGENCY GLOBAL INC.**<br>**Resident Agent**<br>**1519 York Rd**<br>**Lutherville, MD 21093** | * |
| | * |
| **Defendant.** | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

---

## COMPLAINT

COMES NOW Plaintiff Alejandra Joyner, by her undersigned counsel, and pursuant to

Maryland Rule 2-305, and hereby sues 95 Percent Group, LLC ("95 Percent" or "Defendant")

for unlawful discrimination and retaliation in violation of Title VII of the Civil Rights Act ("Title

VII") and Title 20 of Maryland's State Government Article ("Title 20"), and, in support thereof,

states as follows:

### NATURE OF ACTION

1. Ms. Joyner brings this action against her former employer, 95 Percent, in connection with the

   pervasive discrimination to which she was subjected based on her race and ethnicity, as well

as the coordinated retaliation perpetrated by 95 Percent after Ms. Joyner complained about this unlawful discrimination.  After Ms. Joyner approached 95 Percent's Human Resources department to discuss her toxic work environment, including the incessant use of racial slurs and tropes by her immediate supervisor, 95 Percent not only refused to take meaningful action to protect Ms. Joyner, but began systematically denying her opportunities to advance within the company despite her stellar work performance.  Quite incredibly, when 95 Percent begrudgingly initiated an internal investigation into Ms. Joyner's complaints in late 2023, the company used its self-serving findings to escalate its retaliation against Ms. Joyner by placing her on a performance plan, resulting in her constructive discharge.  95 Percent's brazen conduct clearly violates Title VII's and Title 20's respective prohibitions against race discrimination and retaliation.  Ms. Joyner hereby seeks an award of monetary damages to compensate her for lost wages and the enormous emotional distress she suffered as a result of Defendant's actions, reimbursement of her attorneys' fees, and an award of punitive damages to dissuade 95 Percent from engaging in such conduct in the future.

**PARTIES**

2. Ms. Joyner is a resident of the State of Maryland with her principal residence located at 4311 W Forest Park Ave, Baltimore, Maryland 21207.

3. On information and belief, 95 Percent is a Delaware limited liability company with its principal place of business located at 475 Half Day Road, Ste. 300, Lincolnshire, Illinois 60069.

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction over this action pursuant to Md. Code, Cts. & Jud. Proc. § 1-501.

2. This Court has personal jurisdiction over 95 Percent pursuant to Md. Courts Jud. Pro. Code Ann. § 6-103 because 95 Percent knowingly employed Ms. Joyner, and thereby accepted and received the benefits of her employment services, within Anne Arundel County, Maryland, and the claims at issue in this litigation are based upon such employment.

3. Venue is appropriate in this Court because Ms. Joyner was employed by 95 Percent from her residence in Anne Arundel County, during which she suffered discriminatory and retaliatory adverse actions, the effects of which were suffered within this county.

## ADMINISTRATIVE EXHAUSTION OF CLAIMS

4. Ms. Joyner experienced ongoing harassment based on her race, ethnicity and national origin between late 2022 and her constructive discharge on January 9, 2024.  95 Percent also repeatedly denied Ms. Joyner promotions in retaliation for her protected complaints of discrimination, including in late August of 2023, and ultimately took formal disciplinary action against Ms. Joyner on or around January 8, 2024.  Accordingly, Ms. Joyner timely filed her Charge of Discrimination with the EEOC on or around June 18, 2024.

5. On October 17, 2025, Ms. Joyner voluntarily requested that the EEOC provide her a Notice of Right to Sue, which the EEOC issued on November 14, 2025.  As such, Ms. Joyner's last day to bring her claims under Title VII is February 12, 2026, and her last day to bring her claims under Title 20—given that her Charge was pending before the EEOC for 514 days and considering applicable tolling provisions—January 27, 2027.  Accordingly, Ms. Joyner's instant claims under those statutes are timely filed.

## FACTS

### Ms. Joyner's Employment with 95 Percent

3

6. After a highly rewarding and successful tenure as an educator over fifteen years, with a focus on elementary grades and the implementation of innovative and technology-based methods and platforms to enhance literacy, Ms. Joyner accepted employment with 95 Percent as a Sales Development Representative in September of 2022.

7. As a Sales Development Representative, Ms. Joyner developed and implemented processes to maintain and foster new business pipelines for 95 Percent, and also assisted with integration of new clients and/or prospects.

8. Although Ms. Joyner's acceptance of the Sales Development Representative position entailed a relatively significant cut in pay relative to her prior teaching career, 95 Percent assured Ms. Joyner both during the interview process and in the early months of her employment, that she should view her Sales Development Representative position as a steppingstone to more senior positions, specifically a Regional Account Executive – a higher salaried position that had the potential for significant sales-based commissions.

9. During her employment, Ms. Joyner (Hispanic) reported directly to Ms. Jacqueline Whiteman (white/Caucasian), Sales Operations Manager, who, in turn, reported to Ms. Anella Wetter (white/Caucasian), Chief Sales Officer.

10. In light of her exemplary career as a schoolteacher, interpersonal abilities, and passion toward the development of novel programs to further literacy among young students, Ms. Joyner quickly emerged as an excellent performer and thought leader among her colleagues.

11. Indeed, throughout Ms. Joyner's employment with 95 Percent, Ms. Whiteman viewed Ms. Joyner as an indispensable part of her sales team, repeatedly expressing this sentiment in front of other Sales Development Representatives and 95 Percent's senior leadership,

including Ms. Wetter.  Similarly, Regional Account Executives specifically sought to partner with Ms. Joyner due to her aptitude.

12. Only a few months after Ms. Joyner's hiring, Ms. Whiteman promoted Ms. Joyner to the role of Special Projects Manager although, as discussed below, this promotion was rescinded as a result of Ms. Joyner's protected complaints to Human Resources.

13. In addition to excelling in her sales-generating role, in which she secured millions of dollars in revenue, Ms. Joyner further identified and developed new marketing opportunities, including the implementation of "Smores" newsletters for brand awareness.  95 Percent seized upon Ms. Joyner's Smores initiative in 2023, which, on information and belief, generated substantial brand awareness and secured tens of millions of dollars in revenue for the company through account renewals.

14. Ms. Joyner's efforts with respect to the implementation of Smores and marketing planning in New York, Florida, Virginia, Maryland, North Carolina, South Carolina, Arkansas, Maine, Massachusetts and Ohio led to 95 Percent securing millions of dollars in revenue, around $2 million of which Ms. Joyner sourced herself.

15. 95 Percent was well aware of Ms. Joyner's value to the organization.  Indeed, Ms. Joyner received the highest attainable rating ("Significantly Exceeds Expectations") in her 2023 performance evaluation.

16. In September of 2023, Ms. Joyner was recognized by 95 Percent as one of its most successful sales performers for FY 2023 in the company's newsletter and received special recognition for her success developing new marketing approaches and opportunities.

17. 95 Percent's Chief Executive Officer, Brad Lindaas similarly recognized Ms. Joyner and the value of her Smores initiative in a speech delivered before the company in late 2023.

**95 Percent Subjection of Ms. Joyner to a Hostile Work Environment**

18. Despite regularly extolling Ms. Joyner's aptitude for the position and relying upon her as a cornerstone of the sales team, Ms. Whiteman soon became jealous of Ms. Joyner's rapid success and attempted to demean Ms. Joyner through the use of race-based slurs and undermined Ms. Joyner in front of her colleagues.

19. Beginning in late 2022, Ms. Whiteman's racial animus became readily apparent, including Ms. Whiteman expressing surprise by Ms. Joyner's "eloquence."

20. Subsequently, this race-based targeting became more overt, as Ms. Whiteman repeatedly referred to Ms. Joyner—the only Hispanic SDR who reported to Ms. Whiteman—as "Speedy Gonzalez" in team meetings.

21. Ms. Joyner understood Ms. Whiteman's repeated reference to her as "Speedy Gonzalez" as a racist denigration of her Hispanic ethnicity, especially given that Ms. Whiteman only used this name for Ms. Joyner and not any of her non-Hispanic colleagues.

22. Ms. Whiteman similarly used discriminatory language regarding other minorities, including making jokes about "dressing up in black face."

23. Ms. Joyner experienced significant distress by Ms. Whiteman's discriminatory language and repeatedly voiced her discomfort with Ms. Whiteman's use of racist tropes towards her and her colleagues, including raising her concerns to 95 Percent's Human Resources Director, Roderick Abernathy, as well as her second-line supervisor, Ms. Anella Wetter.

24. Notwithstanding Ms. Joyner's complaints, 95 Percent failed to take meaningful action to prevent Ms. Whiteman's harassment of Ms. Joyner based on her race and ethnicity.

25. Tellingly, 95 Percent's indulgence of Ms. Whiteman's discriminatory antics was not limited to its failure to act upon Ms. Joyner's complaints.

26. Around the time of Ms. Joyner's employment with 95 Percent, many other employees, including an African American team member, approached 95 Percent's Human Resources department about the discriminatory environment Ms. Whiteman created among her sales team.

27. Similarly, immediately before Ms. Joyner began her employment at 95 Percent, the company's founder, Ms. Susan Hall, had informally coached Ms. Whiteman due to numerous complaints by her direct reports regarding her fostering of a toxic work environment.

28. Despite 95 Percent being well aware of Ms. Whiteman's propensity toward using racial slurs and other discriminatory language, the company refused to take appropriate action to protect its employees, thereby subjecting Ms. Joyner to a discriminatory hostile work environment throughout most of her employment.

29. Ms. Whiteman soon learned about Ms. Joyner's complaints in late 2022, and only increased her harassment of Ms. Joyner. Indeed, Ms. Whiteman made a point of scolding Ms. Joyner at every opportunity, including depicting Ms. Joyner's suggestions and efforts to take the initiative as instances of insubordination.

### 95 Percent's Retaliation Against Ms. Joyner

30. 95 Percent not only failed to prevent Ms. Whiteman's discriminatory harassment of Ms. Joyner, but quickly began viewing Ms. Joyner as a troublemaker in connection with her complaints about her supervisor's misconduct.

31. By way of example, only a few weeks after Ms. Joyner raised complaints to H.R. Director Roderick Abernathy in February about Ms. Whiteman's use of discriminatory language toward her and other minority sales representatives, 95 Percent rescinded Ms. Joyner's

promotion to Special Projects Manager, a position she had only occupied for around two months.

32. Worse still, and despite having repeatedly reassured Ms. Joyner during her interview process and onboarding of the company's intention to quickly elevate her to Regional Account Executive, 95 Percent inexplicably rejected Ms. Joyner's applications for the position.

33. Given the expectations of advancement set by 95 Percent, Ms. Joyner's non-selection for the Regional Account Executive position caused significant financial hardship.

34. Indeed, Ms. Joyner had accepted a 30% decrease in pay when joining 95 Percent relative to her teaching position.

35. Given her exceptional talent and demonstrated success, on information and belief, Ms. Joyner would have earned multiple six figures a year in a Regional Account Executive role, given the availability of commissions and higher base salary.

36. Based upon the enormous revenue generated by Ms. Joyner's initiatives and marketing strategies, it is likely she could have earned several million dollars in commissions had she been selected for the Regional Account Executive role.

37. Indeed, one of the Regional Account Executive positions for which she was denied was based in California, which had recently allocated $7.5 billion toward literacy development. Had 95 Percent selected Ms. Joyner for the position rather than retaliating against her, she would have been eligible to capture sales from one of the largest education funding allocations in the country, during a period of unprecedented state investment in reading.

38. However, and despite Ms. Joyner clearly being qualified for the position, 95 Percent was resolute in its decision to punish Ms. Joyner for her complaints about Ms. Whiteman.

39. At the end of August of 2023, after once again rejecting Ms. Joyner's candidacy for an open Regional Account Executive role despite her having just received a stellar performance evaluation, Mr. Abernathy affirmed that he would not even consider Ms. Joyner for the position and suggested she leave the company should she be dissatisfied with her current role.

40. Indeed, Mr. Abernathy quite apparently viewed Ms. Joyner as a nuisance given her numerous complaints about Ms. Whiteman over the preceding months, and tellingly offered no explanation for his categorical refusal to consider Ms. Joyner for the promotion.

41. Concerned by what appeared to be a clear retaliatory motive for her non-selection, Ms. Joyner raised her concerns about Mr. Abernathy's refusal to consider her for promotion to 95 Percent's CEO, Mr. Lindaas in September of 2023.

42. Although Mr. Lindaas assured Ms. Joyner that he would coach Mr. Abernathy regarding his demeanor toward her, Ms. Joyner still never obtained the promotion.

43. In addition to Mr. Abernathy, Ms. Wetter was similarly unsympathetic toward Ms. Joyner's complaints about Ms. Whiteman, and soon began targeting Ms. Joyner herself.

44. By way of example, in the summer of 2023, Ms. Wetter supported Ms. Whiteman's campaign to depict Ms. Joyner as insubordinate, including suggesting that Ms. Joyner had "gone rogue" with respect to her development of the Smores initiative.  Ms. Wetter further showed skepticism about the value of the initiative, despite such having already proved remarkably successful at the time.

45. Ms. Wetter and Ms. Whiteman's retaliatory harassment of Ms. Joyner came to a head on September 15, 2023, during an in-person conference at the company's headquarters in Lincolnshire, Illinois.

9

46. During a breakout session at this conference, and in front of over a dozen witnesses, including Ms. Wetter, Ms. Whiteman verbally attacked Ms. Joyner, who was so taken aback she had to leave the room to recompose herself in a nearby bathroom.

47. Rather than reprimanding Ms. Whiteman for her bullying of Ms. Joyner, Ms. Wetter sought out Ms. Joyner in the public bathroom and physically blocked her in the bathroom stall.

48. While blocking Ms. Joyner inside the stall, Ms. Wetter attempted to solicit confessions from Ms. Joyner that she was overreacting to the situation and was too sensitive. Ms. Wetter further warned, "we are not a culture of filing complaints" and "we are not in the business of getting people in trouble."

49. Soon thereafter, Ms. Whiteman joined Ms. Wetter, and both supervisors persisted in the haranguing of Ms. Joyner while physically preventing her from leaving the bathroom despite Ms. Joyner's repeated protests and pleas for the confrontation to stop. Ms. Joyner repeatedly asked for the conversation to not take place in a public company bathroom with others coming in and out to use the facilities as she was being questioned.

50. This confrontation constituted yet another attempt by Ms. Whiteman and Ms. Wetter to punish Ms. Joyner for her prior complaints about Ms. Whiteman's discriminatory conduct and her retaliatory non-selection for promotion, and sought to intimidate Ms. Joyner so as to deter her from making further complaints.

**95 Percent's Use of an Internal Investigation to Force Ms. Joyner's Departure**

51. Notwithstanding the outrageous conduct of Ms. Whiteman and Ms. Wetter at the Illinois conference, Ms. Joyner resolved to make a final attempt to obtain assistance from Human Resources.

52. In October of 2023, Ms. Joyner lodged a comprehensive complaint with Mr. Abernathy detailing the discrimination and retaliation to which she had been subjected since 2022, including Ms. Whiteman's use of discriminatory language toward Ms. Joyner, her repeated non-selection for promotion to Regional Account Executive, and the retaliatory harassment to which she had been subjected by Ms. Wetter and Ms. Whiteman since she first raised her concerns.

53. Despite Mr. Abernathy's open hostility toward Ms. Joyner during this meeting, Ms. Joyner's complaint was ultimately filed, and 95 Percent retained an outside law firm, Akerman LLP, to—ostensibly—carry out an investigation into Ms. Joyner's concerns.

54. However, it soon became apparent that Akerman and 95 Percent had little interest in resolving Ms. Joyner's internal complaint about discrimination and retaliation, but instead intended to use the investigation as a means to *further retaliate* against Ms. Joyner.

55. Indeed, despite Ms. Joyner having provided a list of witnesses who could corroborate the unlawful hostile environment to which she had been subjected for the better part of a year, Akerman elected to interview only Ms. Whiteman, Ms. Wetter, Mr. Abernathy and Ms. Joyner.

56. Unsurprisingly given the ulterior motive for the investigation, as well as the deliberately cursory nature of such, Akerman issued a memorandum on January 8, 2024, which not only found no evidence of discrimination, but instead identified ***Ms. Joyner*** as the only wrongdoer.   Despite Ms. Joyner having initiated the investigation at issue, Akerman issued findings that Ms. Joyner "could not get out her own way" and was disruptive and insubordinate.

57. Incredibly, 95 Percent and its outside counsel used an investigation arising from Ms. Joyner's protected complaint as a means to further tarnish her reputation and retaliate against her.

58. That same day, 95 Percent issued a Performance Improvement Plan to Ms. Joyner expressly citing Akerman's findings when investigating Ms. Joyner's complaints of discrimination. Indeed, the PIP based the adverse action on the Akerman investigative report having "determined that your conduct has proved disruptive to other employees and to the functioning of the Company. That report also determined that while you perform well quantitatively, you are not performing well qualitatively, and that your strong performance quantitatively is being unnecessarily outweighed by your present conduct."

59. Now convinced that 95 Percent had no interest in protecting her from continued discrimination, but instead would stop at nothing to make her work environment intolerable so as to force her from the company, Ms. Joyner resigned her position one day later on January 9, 2024.

60. 95 Percent's shameless retaliation against Ms. Joyner over the course of 2023 caused her enormous emotional distress and mental suffering, which persist to this day.

### COUNT I – DISCRIMINATION
### (Title VII and Title 20)

61. Ms. Joyner hereby restates and incorporates the above allegations as though fully set forth herein.

62. 95 Percent subjected Ms. Joyner to a hostile work environment based on her race, ethnicity, and perceived national origin in violation of Title VII and Title 20.

63. Despite Ms. Joyner's complaints regarding the hostile environment to which she was subjected to 95 Percent, including to the company's Human Resources department and members of its senior leadership, 95 Percent failed to take action against Ms. Whiteman or

12

otherwise protect Ms. Joyner from the race and ethnicity-based harassment to which she was subjected.

64. Because 95 Percent had notice and actual knowledge of the race and ethnicity-based harassment and hostile work environment to which Ms. Joyner was subjected and failed to take remedial action, liability for such discrimination is imputed to 95 Percent.

65. Given the unremedied and intolerable hostile work environment to which she was subjected, Ms. Joyner was compelled to resign her position in January of 2024.

66. Ms. Joyner suffered emotional distress due to 95 Percent knowingly subjecting her to a hostile work environment characterized by race and ethnicity-based harassment, as well as lost wages arising from Ms. Joyner's constructive discharge.

## COUNT II – RETALIATION
### (Title VII and Title 20)

67. Ms. Joyner hereby restates and incorporates the above allegations as though fully set forth herein.

68. Between December of 2022 and October of 2023, Ms. Joyner made numerous complaints to 95 Percent's Human Resources department and members of the company's leadership regarding the race-based harassment and hostile work environment Ms. Joyner suffered.

69. 95 Percent retaliated against Ms. Joyner for engaging in these protected activities by refusing to promote Ms. Joyner despite being clearly qualified, increasing the severity of the workplace bullying to which she was subject, and, in January of 2024, placing Ms. Joyner on a Performance Improvement Plan.

70. Ms. Joyner suffered significant emotional distress due to 95 Percent's retaliatory conduct and lost wages arising from her constructive discharge.

13

## PRAYER FOR RELIEF

WHEREFORE, Ms. Joyner hereby prays that this Court enter an order granting judgment in her favor on all Counts set forth above, and further requests the entry of the following specific relief:

A.  An award of monetary damages in connection with Ms. Joyner's lost wages and emotional distress in an amount greater than $75,000.00;

B.  An award of punitive damages to deter Defendants' flagrant contraventions of public policy and violations of Maryland and federal law in the future;

C.  An award of Ms. Joyner's reasonable attorneys' fees and costs incurred in prosecuting her claims set forth herein; and

D.  All other relief that a trier of fact deems appropriate.

## JURY DEMAND

Ms. Joyner respectfully demands a trial by jury upon all issues so triable.

Respectfully submitted,

_____/s/ David Moon_____
Joyce E. Smithey (AIS No. 0406150286)
David M.E. Moon (AIS No. 1512160128)
SMITHEY LAW GROUP, LLC
706 Giddings Avenue, Suite 200
Annapolis, Maryland 21401
Phone: (410) 919-2990
Fax: (410) 280-1602
joyce.smithey@smitheylaw.com
david.moon@smitheylaw.com
*Attorneys for Plaintiff*