**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| ALEJANDRA JOYNER, | * | |
| *Plaintiff,* | * | |
| v. | * | Civil Action No. RDB-26-1852 |
| 95 PERCENT GROUP, LLC, | * | |
| *Defendant.* | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**<u>MEMORANDUM OPINION</u>**

In this employment discrimination case, Plaintiff Alejandra Joyner ("Plaintiff" or "Ms. Joyner") raises federal and state discrimination and retaliation claims against Defendant 95 Percent Group ("Defendant" or "95 Percent"), where she worked between September 2022 and her resignation on January 9, 2024. (ECF No. 1-2 ¶¶ 6, 12, 31, 59.) On February 12, 2026, Ms. Joyner initiated this action by filing a two-Count Complaint in the Circuit Court for Anne Arundel County, Maryland, alleging: (1) race-, ethnicity-, and perceived national origin-based discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000-e *et seq.* ("Title VII"), and Title 20 of the Maryland State Government Article, MD. CODE ANN., STATE GOV'T §§ 20-101–20-1203 ("Title 20") (Count I); and (2) retaliation, in violation of Title VII and Title 20 (Count II). *See* (ECF No. 1-2 at 1, 12–13).[1] On May 11, 2026, Defendant removed the action to this Court based on federal question jurisdiction of the Title VII claim,

---

[1] Plaintiff's Complaint appears on the docket at both ECF No. 2 and ECF No. 1-2. For clarity and consistency, this Court cites to the Complaint only at ECF No. 1-2.

*see* 28 U.S.C. §§ 1331, 1441, and diversity and supplemental jurisdiction of the Title 20 claim, *see* 28 U.S.C. §§ 1332, 1367. (ECF No. 1.)

Presently pending before this Court is Defendant's Partial Motion to Dismiss ("Defendant's Motion" or "Partial Motion to Dismiss") for failure to state a claim as to (1) Plaintiff's constructive discharge theory of discrimination in Count I, and (2) Plaintiff's retaliation claim in Count II. *See* (ECF No. 10 ¶ 3). Plaintiff has responded in Opposition (ECF No. 11), and Defendant has replied (ECF No. 13). The parties' submissions have been reviewed, and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons set forth below, Defendant's Partial Motion to Dismiss (ECF No. 10) is GRANTED IN PART and DENIED IN PART. Specifically, Defendant's Motion is GRANTED as to Plaintiff's constructive discharge theory of discrimination in Count I, which is DISMISSED to the extent it alleges constructive discharge but remains pending to the extent it alleges hostile work environment. Defendant's Motion is DENIED as to Count II.

## BACKGROUND

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)). Except where otherwise indicated, the following facts are derived from Plaintiff's Complaint (ECF No. 1-2) and accepted as true for the purpose of Defendant's Partial Motion to Dismiss (ECF No. 10).

### I.      Plaintiff's Employment, Work Product, and Qualifications for Advancement

In September 2022, 95 Percent hired Ms. Joyner, a Hispanic woman, as a Sales Development Representative to assist with business generation, marketing, and new and prospective client integration. (ECF No. 1-2 ¶¶ 6–7, 13). Throughout Ms. Joyner's interview and first few months of employment, 95 Percent suggested that she should view her position "as a steppingstone to more senior positions," including the role of Regional Account Executive. (*Id.* ¶¶ 8, 32.) In fact, Ms. Joyner's immediate supervisor, Jacqueline Whiteman ("Ms. Whiteman"), a Caucasian woman, promoted her to Special Projects Manager shortly after she began working at 95 Percent.[2] (*Id.* ¶¶ 9, 12.) As detailed below, that promotion was ultimately rescinded in early 2023. (*Id.* ¶ 12.)

Ms. Joyner maintained "stellar performance" during her time with 95 Percent. (*Id.* ¶¶ 39, 13.) She alleges that she "generated substantial brand awareness and secured tens of millions of dollars in revenue for the company through" her "Smores" initiative and account renewals. (*Id.* ¶¶ 10–11, 13, 14–17, 31, 39). She "received the highest attainable rating ('Significantly Exceeds Expectations') in her 2023 performance evaluation." (*Id.* ¶ 15.) In September 2023, 95 Percent's Chief Executive Officer, Brad Lindaas ("Mr. Lindaas"), applauded Ms. Joyner as one of the company's most successful sales performers, praised her "Smores" initiative's success in a company-wide address, and gave Ms. Joyner special recognition in 95 Percent's newsletter. (*Id.* ¶¶ 16–17.)

---

[2] Ms. Joyner does not allege the date of this promotion but instead alleges that it occurred "[o]nly a few months after" she was hired in September 2022. (ECF No. 1-2 ¶ 12.) As explained below, the promotion allegedly was rescinded on or about February 2023. (*Id.* ¶ 31.) Thus, the promotion appears to have occurred sometime between December 2022 and January 2023.

## II.    Alleged Discriminatory Conduct

Ms. Joyner alleges that, as some point in late 2022, she became aware of her direct supervisor, "Ms. Whiteman's[,] racial animus . . . ." (*Id.* ¶ 19.) She alleges that Ms. Whiteman repeatedly referred to her as "Speedy Gonzalez," a label not used for Ms. Joyner's non-Hispanic colleagues, and expressed her "surprise" at Ms. Joyner's "eloquence." (*Id.* ¶¶ 19–21.) Additionally, she alleges that Ms. Whiteman used discriminatory language toward other minority colleagues, including joking about "dressing up in black face." (*Id.* ¶¶ 22–23, 26–27). Such comments caused Ms. Joyner significant distress, and she "repeatedly voiced her discomfort" regarding Ms. Whiteman's language to 95 Percent's Human Resources Director, Roderick Abernathy ("Mr. Abernathy"), and Ms. Whiteman's immediate supervisor, Anella Wetter ("Ms. Wetter"). (*Id.* ¶¶ 9, 23.) Although Ms. Joyner does not allege the specific dates of such internal complaints, she specifies that she reported Ms. Whiteman's behavior to Mr. Abernathy in February 2023. (*Id.* ¶ 31.) Ms. Joyner alleges that Ms. Whiteman's behavior was known to 95 Percent even before her reports because, in September 2022, 95 Percent's founder "informally coached Ms. Whiteman due to numerous complaints by her direct reports regarding her fostering of a toxic work environment." (*Id.* ¶ 27.) Ms. Joyner alleges that 95 Percent failed to meaningfully address her complaints. (*Id.* ¶ 24.)

## III.    Alleged Retaliatory Conduct

Ms. Joyner alleges that she faced repeated retaliation following her reports of misconduct. After allegedly learning of Ms. Joyner's complaints in late 2022, Ms. Whiteman scolded Ms. Joyner "at every opportunity" and attempted to frame her as "insubordinat[e]." (*Id.* ¶¶ 24–25, 29.) "[A] few weeks after" Ms. Joyner reported Ms. Whiteman's behavior to Mr.

Abernathy in February 2023, 95 Percent rescinded Ms. Joyner's promotion to Special Projects Manager. (*Id.* ¶¶ 12, 31.) In the following months, Ms. Joyner submitted multiple applications for a Regional Account Executive role, but each application was rejected.[3] (*Id.* ¶¶ 32, 39–42.)

According to Ms. Joyner, such retaliation continued into the summer and fall of 2023. In summer 2023, Ms. Wetter allegedly began to support Ms. Whiteman in depicting Ms. Joyner's suggestions and actions regarding the Smores initiative as "troublemak[ing]." *See* (*id.* ¶¶ 29–30, 44–49). In August 2023, Ms. Joyner was again rejected for an open Regional Account Executive role. (*Id.* ¶ 39.) She alleges that she confronted Mr. Abernathy about the rejection, but he declined to explain his refusal to consider her for promotion "and suggested she leave the company should she be dissatisfied with her current role." (*Id.* ¶¶ 39–40.) In September 2023, Ms. Joyner complained to 95 Percent's CEO, Mr. Lindaas, about Mr. Abernathy's refusal to consider her for promotion. (*Id.* ¶ 41.) Mr. Lindaas "assured [her] that he would coach Mr. Abernathy regarding his demeanor toward her."[4] (*Id.* ¶¶ 41–42.)

Ms. Joyner alleges that, on September 15, 2023, Ms. Whiteman "verbally attacked" her during a breakout session of conference at 95 Percent's headquarters. (*Id.* ¶¶ 45–46.) In response, Ms. Joyner excused herself to a nearby bathroom to recompose. (*Id.* ¶ 46.) She alleges that Ms. Wetter, who witnessed the verbal altercation, followed her to the bathroom and physically cornered her in the stall. (*Id.* ¶ 46–47.) Ms. Wetter then attempted to make Ms. Joyner admit that she was "overreacting to the situation and was too sensitive" because complaints of discrimination did not align with the company's culture. (*Id.* ¶ 48). According to

---

[3] Ms. Joyner does not allege the dates of these applications. *See generally* (ECF No. 1-2).

[4] The specific date of this complaint to Mr. Lindaas is unclear, although it occurred at some point in September 2023. *See generally* (ECF No. 1-2 ¶ 40).

Ms. Joyner, Ms. Wetter specifically stated, "we are not a culture of filing complaints" and "we are not in the business of getting people in trouble." (*Id.*) Ms. Joyner further alleges that Ms. Whiteman soon joined Ms. Wetter in "physically preventing her from leaving the bathroom, despite Ms. Joyner's repeated" requests to end the conversation or speak elsewhere. (*Id.* ¶ 49.)

In October 2023, Ms. Joyner filed a formal complaint with Mr. Abernathy detailing each alleged instance of discrimination and retaliation—Ms. Whiteman's discriminatory language, Ms. Joyner's non-selection for promotions, and the alleged retaliatory harassment from Ms. Whiteman and Ms. Wetter, including the bathroom incident—since 2022. (*Id.* ¶ 52.) She alleges that Mr. Abernathy appeared openly hostile toward her throughout that meeting. (*Id.* ¶ 53.) 95 Percent then retained an outside law firm, Akerman LLP ("Akerman"), to investigate the allegations. (*Id.* ¶ 53.) Although Ms. Joyner provided a list of witnesses to corroborate her allegations, Akerman only interviewed Ms. Joyner, Ms. Whiteman, Ms. Wetter, and Mr. Abernathy. (*Id.* ¶ 55.) On January 8, 2024, Akerman concluded its investigation by finding no evidence of discrimination and "identif[ying] *Ms. Joyner* as the only wrongdoer." (*Id.* ¶ 56.) That same day, 95 Percent issued Ms. Joyner a Performance Improvement Plan ("PIP"), which stated that the Akerman investigation found that Ms. Joyner's "conduct ha[d] proved disruptive to other employees and to the functioning of the Company," and needed correction despite her quantitative success with 95 Percent. (*Id.* ¶ 58.) The next day, on January 9, 2024, Ms. Joyner resigned. (*Id.* ¶ 59.)

## IV.    Procedural History

Just over five months later, on June 18, 2024, Ms. Joyner filed a formal Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶ 4.)

"On October 17, 2025, [she] voluntarily requested that the EEOC provide her a Notice of Right to Sue, which the EEOC issued on November 14, 2025."[5] (*Id.* ¶ 5.) On February 12, 2026, Ms. Joyner initiated this action by filing a two-Count Complaint in the Circuit Court for Anne Arundel County, Maryland, alleging (1) race-, ethnicity-, and perceived national origin-based discrimination, in violation of Title VII and Title 20 (Count I); and (2) retaliation, in violation of Title VII and Title 20 (Count II). *See* (ECF No. 1-2). On May 11, 2026, Defendant removed the action to this Court.[6] (ECF No. 1). On June 1, 2026, 95 Percent filed a Partial Motion to Dismiss (ECF No. 10) Ms. Joyner's constructive discharge theory of discrimination in Count I and her retaliation claim in Count II. Ms. Joyner has responded in Opposition (ECF No. 11), and 95 Percent has replied (ECF No. 13). This matter is now ripe for review.

## STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. "'[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint' and not to 'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).

---

[5] The EEOC issues Notice of Right to Sue letters if it is unable to conclude that there is reasonable cause to believe discrimination occurred. If the EEOC concludes that there is such reasonable cause, it issues a Letter of Determination. *See What You Can Expect After a Charge is Filed*, U.S. EQUAL EMP. OPPORTUNITY COMM'N, https://www.eeoc.gov/employers/what-you-can-expect-after-charge-filed (last visited Jun. 30, 2026).

[6] This Court has federal question jurisdiction of the Title VII claim under 28 U.S.C. § 1331 and both diversity and supplemental jurisdiction of the Title 20 claims under 28 U.S.C. §§ 1332, 1367. *See* (ECF No. 1 ¶ 4; ECF No. 1-1 at 1; ECF No. 1-2 ¶¶ 2–3, at 14); 28 U.S.C. § 1441 (authorizing removal jurisdiction).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action . . . ." *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). A complaint need not include "detailed factual allegations." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A complaint must, however, set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable, and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim. *Iqbal*, 556 U.S. at 678; *see A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011).

## ANALYSIS

In this case, Ms. Joyner alleges discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and Title 20 of Maryland's State Government Article. *See* (ECF No. 1-2 at 1, 12–13). Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, proscribes discrimination in employment based on race, color, religion, sex, or national origin. *Id.* § 2000e-2(a)(1). Title 20, commonly known as the Maryland Fair Employment Practices Act, ("MFEPA"), is Maryland's "analogue to the federal employment discrimination statutes," including Title VII. *Gaines v. Balt. Police Dep't*, 657 F. Supp. 3d 708, 755 (D. Md. 2023). As Judge Bredar of this Court has noted, generally "courts judge discrimination and retaliation

8

claims brought under [Title 20] by the same standards as those same claims brought under Title VII."[7] *Lowman v. Md. Aviation Admin.*, Civ. No. JKB-18-1146, 2019 WL 133267, at *4 (D. Md. Jan. 8, 2019); *see also Gaines*, 657 F. Supp. 3d at 755–56; *Barreto v. SGT, Inc.*, 826 F. App'x 267, 271 (4th Cir. 2020). In Count I of this case, Ms. Joyner alleges discrimination in violation of Title VII and Title 20 based on hostile work environment and constructive discharge. (*Id.* ¶¶ 63–65.) In Count II, she alleges retaliation in violation of Title VII and Title 20, also resulting in a hostile work environment and her constructive discharge. (*Id.* ¶¶ 68–70.)

Although Plaintiff invokes theories of hostile work environment and constructive discharge under both Counts, her claims arise from different statutory provisions with distinct purposes. As the Supreme Court has explained, Title VII contains both an antidiscrimination provision and an antiretaliation provision. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). "[T]he substantive [antidiscrimination] provision seeks to prevent injury to individuals based on who they are, *i.e.*, their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct." *Id.* As a result, a claim of discrimination must be based on protected status, while a claim of retaliation must be based on protected activity. *See, e.g.*, *Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 357–58 (2024) (contrasting the two claims); *Evans v. Int'l Paper Co.*, 936 F.3d 183, 192–95 (4th Cir. 2019) (requiring showing of *discrimination* to succeed on constructive discharge discrimination claim, but showing of *retaliation* to succeed on constructive discharge retaliation claim); *Laurent-Workman v. Wormuth*, 54 F.4th 201, 210–14, 216–19 (4th Cir. 2022). Title 20 of Maryland's

---

[7] Title 20 and Title VII have distinct procedural requirements regarding exhaustion, *see, e.g.*, *Hollis v. Morgan State Univ.*, 153 F.4th 369, 380–81 (4th Cir. 2025), which are not at issue in this case.

State Government Article applies a similar distinction. *See, e.g.*, *Magassouba v. Prince George's Cnty.*, 773 F. Supp. 3d 196, 221, 214–15 (D. Md. 2025) (explaining Title 20 antidiscrimination and antiretaliation provisions and evaluating them under Title VII framework). Thus, Ms. Joyner's discrimination claim in Count I must allege discriminatory conduct tied to her asserted protected characteristic, while her retaliation claim in Count II must allege retaliatory conduct based on her alleged protected activity. The Court analyzes each claim in turn under the applicable Title VII framework. *See, e.g.*, *Barreto*, 826 F. App'x at 271.

## I.    Discrimination (Count I)

An employment discrimination claim may allege either direct or circumstantial evidence of discrimination. *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom.*, *Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30 (2012). Where, as here, a plaintiff alleges only circumstantial evidence,[8] "the elements of a prima facie case of discrimination under Title VII [and, therefore, Title 20,] are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Id.* At the pleading stage, "an employment discrimination plaintiff need not plead a prima facie case of discrimination" but instead must "allege[] facts that plausibly state a violation of Title VII 'above a speculative level.'" *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616–17 (4th Cir. 2020) (quoting *Coleman*, 626 F.3d at 190). In other words, the facts alleged must "support a *reasonable inference* that the decisionmakers were

---

[8] "Direct evidence is 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Bandy v. City of Salem*, 59 F.4th 705, 711 (4th Cir. 2023) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc) *abrogated on other grounds by Desert Palace v. Costa*, 539 U.S. 90, 98 (2003)). "Consequently, a plaintiff faces a demanding standard when attempting to demonstrate direct evidence." *Jordan v. Radiology Imaging Assocs.*, 577 F. Supp. 2d 771, 779 (D. Md. 2008).

motivated by bias." *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 586 (4th Cir. 2015) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In this case, Defendant contends that Ms. Joyner has not adequately alleged constructive discharge as an adverse employment action.[9]

Plaintiff offers two theories of adverse employment action: hostile work environment and constructive discharge. *See* (ECF No. 10 ¶ 3–5). 95 Percent seeks dismissal of Count I only to the extent it alleges constructive discharge, however. (*Id.*) Where, as here, a plaintiff alleges constructive discharge as the product of a hostile work environment, the claim is treated as a compound theory requiring satisfaction of both the hostile work environment elements and the additional, more demanding intolerability standard applied to constructive discharge. *Evans v. Int'l Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019) (citing *Pa. State Police v. Suders*, 542 U.S. 129, 146–47 (2004)); *Decoster v. Becerra*, 119 F.4th 332, 339 (4th Cir. 2024). "[I]ntolerability is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign, . . . that is, whether he would have had *no choice* but to resign." *Evans*, 936 F.3d at 193 (second alteration in original) (internal quotations and citations omitted). As Judge Hollander of this Court has aptly observed, "[i]ntolerability

---

[9] Defendant does not contest the remaining elements of a prima facie claim of discrimination. *See* (ECF No. 10 ¶¶ 3–5; ECF No. 10-1 at 5). As to the first element, Ms. Joyner alleges that, as a Hispanic woman, she is a member of a protected class. (ECF No. 1-2 ¶¶ 9, 20–21); *De La Torre v. Fink*, Civ. No. PX-23-3203, 2025 WL 460757, at *1 n.3 (D. Md Feb. 11, 2025) (citing *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 n.3 (4th Cir. 2018)). As to the second element, a plaintiff must allege that she "satisf[ied] the normal requirements [of the] work." *Hughley v. Md.-Nat'l Cap. Park & Plan. Comm'n*, 668 F. Supp. 469, 474 (D. Md. 1987) (citations omitted). Ms. Joyner has alleged that she was publicly congratulated for "securing millions of dollars in revenue" for 95 Percent, she "received the highest attainable rating ('Significantly Exceeds Expectations') in her 2023 performance evaluation," and even her PIP stated that she "perform[ed] well quantitatively." (ECF No. 1-2 ¶¶ 13–17, 58.) Lastly, allegations that an employer used nicknames only for members of a protected class but not for those outside that class sufficiently allege differential treatment under the fourth element. *Cf. King v. E. Shore Water, LLC*, Civ. No. SKG-11-1482, 2012 WL 3155647, at *16 (D. Md. Jul. 31, 2012) (rejecting differential treatment where employer used nicknames for black and white employees). Here, Ms. Joyner has alleged that "Ms. Whiteman only used th[e] name ["Speedy Gonzalez"] for Ms. Joyner and not any of her non-Hispanic colleagues." (ECF No. 1-2 ¶ 21.)

is a high bar. Without more, 'difficult or unpleasant working conditions and denial of management positions . . . are not so intolerable as to compel a reasonable person to resign.'" *Gaines v. Balt. Police Dep't*, 657 F. Supp. 3d 708, 741 (D. Md. 2023) (quoting *Evans*, 936 F.3d at 193). Even assuming, without deciding, that Ms. Joyner has alleged a hostile work environment, she has not alleged facts sufficient to state the intolerability required for constructive discharge.

Courts evaluate intolerability under the totality of the circumstances, and "the frequency of the conditions at issue" is an important consideration. *See Evans*, 936 F.3d at 192, 193 (citing *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1132 (4th Cir. 1995)). Vague allegations of ongoing discriminatory conduct, including limited instances of discriminatory statements, are not sufficient. *See, e.g.*, *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 263 (4th Cir. 2006) (explaining comments "may reveal an insensitivity to [the employee's protected status], [but] they do not nearly rise to the level of intolerability"); *Franovich v. Hanson*, 687 F. Supp. 3d 670, 688 (D. Md. 2023) (concluding allegations of "mostly continuous" discriminatory conduct insufficient). The Fourth Circuit has recognized that, absent "any detail, context, examples, or time frame," general statements that an employer repeatedly "used a racial slur" "are [simply] insufficient to sustain an actionable Title VII claim." *Equal Emp. Opportunity Comm'n v. Xerxes Corp.*, 639 F.3d 658, 677 (4th Cir. 2011) (alteration in original) (citations omitted); *see also Decoster*, 119 F.4th at 341 n.2 ("Without more, [a conclusory] allegation cannot support a plausible claim for hostile work environment and constructive discharge based on race discrimination." (citing *Coleman*, 626 F.3d at 191)). Significantly, "mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or

12

unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Hammoud v. Jimmy's Seafood, Inc.*, 618 F. Supp. 3d 219, 230 (D. Md. 2022) (quoting *Heiko*, 434 F.3d at 262). Finally, evidence of an employee's strong performance may weigh against a finding of intolerability. *See Evans*, 936 F.3d at 188–89, 194.

In this case, Ms. Whiteman's alleged uses of "racist tropes" with respect to Ms. Joyner do not rise to the level of intolerability necessary to support a claim of constructive discharge.[10] *See* (ECF No. 1-2 ¶¶ 19–23). Ms. Whiteman's derogatory remarks began in late 2022, and many employees, including Ms. Joyner, complained about them to Human Resources. (*Id.* ¶¶ 19, 22–23, 26.) When Ms. Whiteman "learned about Ms. Joyner's complaints in late 2022," her negative treatment of Ms. Joyner allegedly shifted from discriminatory comments to framing Ms. Joyner as the source of the tensions.[11] *See* (*id.* ¶¶ 29–31, 38–58). Thus, Ms. Joyner does not allege that any discriminatory remarks continued after Ms. Whiteman learned of her complaints in late 2022. *See generally* (*id.*). Although Ms. Joyner alleges "repeated" and "ongoing harassment" (*id.* ¶¶ 4, 19–21), such vague, "general statements" about Ms. Whiteman's alleged discriminatory conduct, "unsupported by any details, context, examples, or time frame," are insufficient to allege discrimination based on constructive discharge. *Xerxes*, 639 F.3d at 677. Absent further specific allegations, Ms. Whiteman's discriminatory comments are "difficult or unpleasant working conditions . . . not so intolerable as to compel a reasonable person to resign." *Hammoud*, 618 F. Supp. 3d at 230 (quoting *Heiko*, 434 F.3d at 262); *see also Evans*, 936

---

[10] As detailed above, only conduct connected to Ms. Joyner's race, ethnicity, or perceived national origin—as opposed to retaliatory conduct connected to her protected reports of discrimination—is at issue in her discrimination claim in Count I. *See, e.g.*, *Burlington*, 548 U.S. at 63.

[11] While Ms. Joyner alleges that multiple of Defendant's agents retaliated against her, she alleges discrimination only from Ms. Whiteman. *See* (ECF No. 1-2 ¶¶ 4, 18–31, 37–59).

F.3d at 193 (deeming racially insensitive or offensive remarks insufficient to allege intolerability).

Furthermore, Ms. Joyner's allegations regarding her positive performance—including promotion to Special Projects Manager, recognition "as one of [Defendant's] most successful sales performers for [Fiscal Year] 2023 in the company's newsletter," and receipt of "the highest attainable rating . . . in her 2023 performance evaluation"—suggest that she did not feel as if she "had *no choice* but to resign" due to the alleged discriminatory conduct. *See* (ECF No. 1-2 ¶¶ 11–17); *Evans*, 936 F.3d at 188–89, 194 (concluding that strong performance—including earning the highest possible performance evaluation rating, receiving company awards, and identification as a potential leader in the company—"cannot, from an objective perspective, be construed to leave her no choice but to resign"). As such, Ms. Joyner has not alleged facts sufficient to meet constructive discharge's high "intolerability" bar. *See Gaines*, 657 F. Supp. 3d at 741. Defendant's Motion is GRANTED as to the discrimination claim in Count I to the extent that claim relies on a theory of constructive discharge.[12]

## II. Retaliation (Count II)

As noted above, Defendant seeks to dismiss Ms. Joyner's retaliation claim in Count II in its entirety. (ECF No. 10 ¶¶ 3, 5.) To survive a Rule 12(b)(6) motion on a retaliation claim under Title VII—and, therefore, under Title 20 of the Maryland State Government Article— a plaintiff must plausibly allege three elements: "(1) that she engaged in protected activity; (2) that [her] employer took a materially adverse action against her; and (3) [that] there is a causal

---

[12] As noted above, Defendant only seeks to dismiss Ms. Joyner's constructive discharge theory, and not her hostile work environment theory, asserted in Count I. (ECF No. 10 ¶¶ 3–5.) Accordingly, the hostile work environment theory of discrimination in Count I remains pending.

connection between the protected activity and the adverse action." *Evans*, 936 F.3d at 195 (citing *Burlington*, 548 U.S. at 61–68). In this case, 95 Percent challenges the second and third elements, but it argues that Ms. Joyner's October 2023 complaint is the only material instance of protected activity. *See* (ECF No. 10 at 2 ¶ 5; ECF No. 10-1 at 7, 8, 16). In Opposition, Plaintiff asserts that she has sufficiently alleged each element of retaliation and that she engaged in multiple instances of protected activity before her October 2023 report to Mr. Abernathy. *See, e.g.*, (ECF No. 11 at 6 (discussing protected activities)). As explained below, Ms. Joyner has alleged facts sufficient to state a claim of retaliation.

### A. Protected Activity

Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), protects employees from retaliation for (1) opposing unlawful employment practices under the statute's opposition clause, and (2) participating in Title VII proceedings under its participation clause.[13] *See, e.g.*, *Netter v. Barnes*, 908 F.3d 932, 937–38 (4th Cir. 2018) (citations omitted). As relevant to Ms. Joyner's retaliation claim, "an employee need not engage in the formal process of adjudicating a [Title VII] claim" to bring a claim under the oppositional activity category. *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) (citing *Armstrong v. Index J. Co.*, 647 F.2d 441, 448 (4th Cir. 1981)). Rather, "[o]pposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Id.* (citing *Armstrong*, 647 F.2d at

---

[13] The participation clause only covers investigations that occur in conjunction with or after the filing of a formal charge with the EEOC. *See Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018) (citations omitted); *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) (denying participation clause applicability where there was "no ongoing investigation, proceeding or hearing in which [Plaintiff] could participate at the time" of the alleged retaliatory conduct (internal quotation marks omitted)).

448). That is, protected oppositional activity "includes 'complaining to superiors about suspected violations of Title VII.'" *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 328 (4th Cir. 2018) (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc)). In this case, Ms. Joyner informally reported her concerns of discrimination as early as February 2023, but she did not file a formal charge with the EEOC until June 18, 2024, more than five months after she resigned on January 9, 2024. (ECF No. 1-2 ¶ 4.) As such, her activity is only protected under Title VII's antiretaliation provision to the extent it was oppositional activity.

To raise a retaliation claim based on oppositional activity, an employee "must show (1) that she reasonably believed that the employment action she opposed constituted a Title VII violation, and (2) that her conduct in opposition was reasonable." *Netter*, 908 F.3d at 937–38 (first citing *Boyer-Liberto*, 786 F.3d at 282; and then citing *Laughlin*, 149 F.3d at 259–60). "[C]omplaining to the employer and participating in an employer's informal grievance procedures, when done in a manner that is 'not disruptive or disorderly,' constitute [reasonable] opposition activities that merit protection under Title VII." *Laughlin*, 149 F.3d at 260 (internal citations omitted). In this case, Ms. Joyner has alleged the second element of oppositional activity by alleging that she informally complained of discrimination as early as February 2023, informally reported retaliation to the CEO as early as September 2023, and filed a  formal complaint with Human Resources as to both discrimination and retaliation as early as October 2023. (ECF No. 1-2 ¶¶ 4, 23, 31, 40–43, 51–53.) At minimum, Ms. Joyner's complaints in September and October 2023 of retaliation in violation of Title VII were reasonable opposition activities. (*Id.*); *see Laughlin*, 149 F.3d at 260 (citations omitted). The first element of retaliation presents a slightly more nuanced inquiry in this case, however.

To allege the first element of retaliation under Title VII, a plaintiff must allege "an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress . . . ." *McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 411 (4th Cir. 2022) (quoting *Boyer-Liberto*, 786 F.3d at 282). This includes allegations that the relevant decisionmaker knew "not only . . . that the activity occurred, but also . . . that the employee engaged in the protected activity because the employee had a reasonable belief that a Title VII violation occurred." *Id.* at 412 (internal citation omitted) (citing *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021)). The Fourth Circuit has confirmed that "'an unlawful employment practice' under Title VII" includes not only the original discriminatory harassment but also "an emerging retaliatory hostile work environment" and retaliatory adverse actions taken in response to prior complaints. *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417, 420 (4th Cir. 2015) (citations omitted); *see also* 42 U.S.C. § 2000e-3(a) (identifying retaliation as unlawful employment practice). As detailed below, Ms. Joyner has sufficiently alleged the first element of retaliation by alleging facts sufficient to show an objectively reasonable belief that a retaliatory hostile work environment was developing in response to her complaints.[14] *See DeMasters*, 796 F.3d at 420; *Netter*, 908 F.3d at 937–38.

An employee need not prove that the underlying conduct leading to her protected activity *actually* violated Title VII—only that she had a good-faith, objectively reasonable belief that it did. *See, e.g.*, *Strothers*, 895 F.3d at 327, 333 (citing *Boyer-Liberto*, 786 F.3d at 282). Where

---

[14] Defendant has not addressed whether Ms. Joyner plausibly alleged a racially discriminatory hostile work environment prior to her first complaint of discrimination in February 2023. *See generally* (ECF No. 10; ECF No. 10-1; ECF No. 13). For this reason, the Court focuses on whether Ms. Joyner has sufficiently alleged an emerging retaliatory hostile work environment in response to her various alleged complaints. *See, e.g.*, (ECF No. 1-2 ¶¶ 12, 24–25, 29–32, 39–42, 44–49, 52–58).

17

an employee alleges as protected activity complaints of a hostile work environment, the reasonableness "inquiry is whether the circumstances known to [the plaintiff] at the time of her complaint support a reasonable belief that a hostile work environment existed or was in progress," meaning "she must show that her belief that the[] elements [of a hostile work environment claim] were satisfied was reasonable." *Id.* at 328 (citing *Boyer-Liberto*, 786 F.3d at 282). The elements of a hostile work environment include: "(1) unwelcome conduct; (2) that is based on the plaintiff's [protected activity]; (3) which is sufficiently severe or pervasive to alter her conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Id.* (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)).

At this pleading stage, Ms. Joyner has sufficiently alleged an objectively reasonable belief that she was subject to a developing hostile work environment. Under the first element of hostile work environment, "an employee can demonstrate that certain conduct is unwelcome simply by voicing her objection to the alleged harasser or to the employer. The alleged conduct need not be severe, as severity is better addressed under the third element[.]" *Id.* at 328–29 (citations omitted). Ms. Joyner alleges multiple instances of "voic[ing] her discomfort" to Ms. Whiteman, Ms. Wetter, the company CEO, and Human Resources. (ECF No. 1-2 ¶¶ 23, 24–25, 31, 40, 41, 52). Relatedly, under the second element, an employee may demonstrate that conduct is related to her protected activity based on the totality of the circumstances, including the "social context" of the alleged conduct. *Strothers*, 895 F.3d at 329; *accord Gordon v. Heath*, 179 F.4th 263, 272–73 (4th Cir. 2026). Ms. Joyner has alleged that the unwelcome conduct included cornering her in a bathroom while commenting that

18

complaining did not fit the company's culture, which alone is sufficient to allege that the unwelcome conduct related to her complaints. (ECF No. 1-2 ¶¶ 45–49). Moreover, she has sufficiently alleged that the demotion and refusal to promote also occurred at least in part in response to her complaints. *See* (*id.* ¶¶ 12, 31–32, 39–42, 45–49).

With respect to the third element of a hostile work environment, "[t]he employee must both personally and reasonably believe that the conduct rises to the level of a hostile environment." *Strothers*, 895 F.3d at 331 (citing *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003)). The personal belief aspect can be satisfied simply by raising "numerous complaints and . . . characteriz[ing] such behavior as creating a hostile environment." *Id.* at 331 n.5. For the objective component, "an employee will have a reasonable belief that a hostile work environment is occurring based on an isolated incident if that harassment was physically threatening or humiliating." *Id.* at 331. In this case, Ms. Joyner has sufficiently alleged the subjective belief component because she repeatedly raised complaints of a hostile work environment. *See* (ECF No. 1-2 ¶¶ 23–25, 40, 43, 52). Likewise, she has sufficiently alleged an objectively reasonable belief based on the alleged bathroom incident on September 15, 2023. Ms. Joyner alleges that during this incident, Ms. Wetter and Ms. Whiteman physically blocked her from leaving the bathroom, ignored her "repeated protests and pleas for the confrontation to stop" and her requests "for the conversation to not take place in a public company bathroom with others coming in and out to use the facilities as she was being questioned." (ECF No. 1-2 ¶¶ 45–49.) Such allegations of a "physically threatening" and "humiliating" incident in the workplace are sufficient to allege an objective belief in a developing retaliatory hostile work environment. *Strothers*, 895 F.3d at 331; *see also Boyer-Liberto*, 786 F.3d at 284.

19

Finally, she has sufficiently alleged that the unwelcome conduct as to the bathroom incident was imputable to 95 Percent. Generally, conduct by a supervisor is imputable to the employer. *See, e.g.*, *Boyer-Liberto*, 786 F.3d at 278 (discussing liability in context of both co-worker and supervisor). Ms. Whiteman and Ms. Wetter were Ms. Joyner's immediate and second-line supervisors, respectively, and they allegedly cornered and "harangued" her in the bathroom of 95 Percent's headquarters *during* a company-wide conference such that their conduct is imputable to 95 Percent. (ECF No. 1-2 ¶¶ 9, 23, 45–49.) Accordingly, Ms. Joyner has sufficiently alleged that her complaints about the allegedly hostile work environment, beginning in late 2022 and culminating in her report to Human Resources in October 2023, *see* (ECF No. 1-2 ¶¶ 4, 29), constitute protected activity as to the first element of her retaliation claim in Count II.

### B. Materially Adverse Action

Under the second element of a retaliation claim, a plaintiff must allege a materially adverse action, which broadly encompasses any action that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination[]'"—that is, from engaging in protected activity. *Burlington*, 548 U.S. at 68 (citations omitted); *see also Muldrow*, 601 U.S. at 357–58; *Herkert v. Bisignano*, 151 F.4th 157, 165–66 (4th Cir. 2025). This standard extends beyond formal employment consequences and can include supervisor conduct that, taken together, would deter a reasonable employee from continuing to complain. *Burlington*, 548 U.S. at 63; *see also Herkert*, 151 F.4th at 166–67 (distinguishing "materially adverse actions" in retaliation claims from "adverse employment actions" in discrimination claims (citations omitted)). In this case, Ms. Joyner alleges three forms of retaliation: (1) refusal to promote her,

(2) "increasing the severity of the workplace bullying to which she was subject," and (3) placement on a Performance Improvement Plan ("PIP"). (ECF No. 1-2 ¶ 69.) As Defendant notes, Ms. Joyner's placement on the PIP and her constructive discharge are the only materially adverse actions that occurred between her protected October 2023 complaint and her January 2024 constructive discharge. *See* (ECF No. 10-1 at 13–14, 17; ECF No. 13 at 2–4). These facts are sufficient to allege materially adverse employment action for purposes of Ms. Joyner's retaliation claim.

First, because the materially adverse action standard for retaliation claims is significantly broader than that for discrimination claims, placement on a PIP may constitute a materially adverse action based on the facts of a given case. *See Emami v. Bolden*, 241 F. Supp. 3d 673, 685 (E.D. Va. 2017) (surveying caselaw); *Lanir v. Yorktown Sys. Grp., Inc.*, 527 F. Supp. 3d 817, 823 (E.D. Va. 2021) ("[T]here is a genuine dispute of material fact as to whether the PIP qualifies as materially adverse employment action . . . ."); *Brown v. Hous. Auth. of Balt. City*, Civ. No. MJG-16-3616, 2017 WL 3189447, at *7 (D. Md. Jul. 26, 2017) (assuming placement on a PIP constituted an actionable adverse action for retaliation claim (footnote omitted)). Although Ms. Joyner's PIP did not include any tangible consequences before she resigned the next day, it explicitly cited the investigation that Ms. Joyner requested *regarding her prior complaints* as the sole reason for its issuance. (ECF No. 1-2 ¶ 58.) Indeed, the PIP itself acknowledged that Ms. Joyner's work product was satisfactory. (*Id.*) As alleged, therefore, the PIP admitted that Ms. Joyner's work was satisfactory and she was placed on a PIP only in response to her complaints. That Ms. Joyner received a PIP simply because she requested an internal investigation into suspected instances of discrimination and retaliation "might have

21

dissuaded a reasonable worker from" requesting such an investigation in the first place. *Burlington*, 548 U.S. at 68 (internal quotations and citations omitted).

Second, courts may consider an accumulation of adverse actions in retaliation claims, particularly where adverse actions increase or become more drastic after a protected activity. Generally, "gradual adverse job actions [that] began well before the plaintiff had ever engaged in any protected activity" do not support an inference of retaliation. *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)). Importantly, however, where adverse actions are not gradual, temporally relate to protected activity, and become harsher following protected complaints, an inference of retaliation may arise. *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 654 (4th Cir. 2021). Under such circumstances, "[a] reasonable factfinder could find that after [the employee] submitted an internal complaint, [the employer] decided to take the more drastic approach[,]" creating an inference of retaliation. *Id.*; *see also Barnhill v. Garland*, 636 F. Supp. 3d 592, 60 (E.D. Va. 2022) ("[*Francis*'s] principle is not applicable where the gradual adverse actions have little or no connection to the adverse action(s) occurring post protected activity." (citing *Francis*, 452 F.3d at 309)). This distinction is critical in this case because, as alleged, only after Ms. Joyner "submitted an internal complaint[ did 95 Percent] decide[] to take the more drastic approach" of issuing a PIP that explicitly stated it would not have been issued but for her October 2023 complaint. *Sempowich*, 19 F.4th at 654; *see* (ECF No. 1-2 ¶ 58).

Third, Ms. Joyner also alleges that she was constructively discharged. (ECF No. 1-2 ¶¶ 65, 70.) Although, for the reasons discussed above, she has not alleged constructive discharge as to her discrimination claim, her allegations of ongoing retaliation are sufficient to

allege constructive discharge as to her retaliation claim. *See, e.g.*, *Evans v. Int'l Paper Co.*, 936 F.3d 183, 192–95 (4th Cir. 2019) (requiring showing of *discrimination* to succeed on constructive discharge discrimination claim but showing of *retaliation* to succeed on constructive discharge retaliation claim). As noted above, constructive discharge claims demand a higher, objective intolerability standard, but the events precipitating an employee's constructive discharge remain relevant. *See, e.g.*, *id.* at 192–93 (a reasonable employee must feel as if they "had *no choice* but to resign" (citations omitted)). That is, "[c]ontext matters" in a claim alleging constructive discharge. *Burlington*, 548 U.S. at 69. In this case, Ms. Joyner alleges numerous instances of retaliation that, combined, might plausibly lead a reasonable employee to feel as though she "had *no choice* but to resign." *See Evans*, 936 F.3d at 193 (citations omitted). She alleges, for example, that (1) "95 Percent rescinded [her] promotion to Special Projects Manager" just "a few weeks after [having] raised complaints," (ECF No. 1-2 ¶ 31); (2) 95 Percent repeatedly rejected her applications for promotion to the role she was "assured" while interviewing and onboarding, despite her "stellar performance," (*id.* ¶¶ 8, 11–17, 32–41); and (3) Mr. Abernathy was "open[ly] hostil[e] toward" her *while she was filing* her protected complaint, (*id.* ¶ 53). Under the totality of the circumstances and in the context of the September 15, 2023, bathroom incident (*id.* ¶¶ 45–49), Ms. Joyner has sufficiently alleged intolerability so as to allege constructive discharge as a materially adverse action for her retaliation claim in Count II.

### C. Causation

Finally, a retaliatory hostile work environment or constructive discharge must be causally connected to protected activity. *E.g.*, *Laurent-Workman*, 54 F.4th at 219. A plaintiff may show causation either through close temporal proximity or "by showing 'the existence of

facts that suggest that the adverse action occurred because of the protected activity,' or a combination of the two." *Id.* at 218–19 (alteration in original) (quoting *Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021)). As relevant to this case, "even in the absence of temporal proximity, causation can be established through a pervasive sequence of intervening events indicating disdain for or intermeddling with the protected activity." *Barnhill v. Bondi*, 138 F.4th 123, 132 (4th Cir. 2025). Specifically, allegations showing recurring retaliatory animus and conduct during the intervening period and inconsistencies in the employer's treatment of the plaintiff or in the proffered reasons for the adverse action may show causation. *Barbour v. Garland*, 105 F.4th 579, 596 (4th Cir. 2024) (citations omitted). In this case, Ms. Joyner has plausibly alleged that the retaliatory constructive discharge and hostile work environment occurred because of her internal complaints.[15]

In this case, the alleged pattern of escalating adverse actions—demotions, failure to promote, cornering Ms. Joyner in the bathroom to caution her against "filing complaints" (ECF No. 1-2 ¶¶ 12, 31–32, 39–42, 45–49)—after each successive complaint constitutes recurring retaliatory conduct. *See, e.g.*, *Magassouba v. Prince George's Cnty.*, Civ. No. TJS-23-0767, 2026 WL 1396051, at *5 (D. Md. May 19, 2026) (explaining pervasive deterioration of working relationship may show causation); *Barbour*, 105 F.4th 193–94 (explaining multiple instances of miscommunication regarding pending application may show causation). Moreover, an inference of causation arises where an employer provides the employee positive feedback

---

[15] As explained above, the Complaint alleges multiple instances of Ms. Joyner engaging in protected oppositional activity—including raising complaints to supervisors—before filing her last protected complaint in October 2023. *See* (ECF No. 1-2 ¶¶ 4, 23, 31, 40–43, 52); *Strothers*, 895 F.3d at 328 (quoting *Boyer-Liberto*, 786 F.3d at 281).

about her performance but, after protected activity, suddenly justifies an adverse action against her through "dubious and varying" assertions. *Barbour*, 105 F.4th at 586, 590, 593–94, 598–99 (citations omitted). The inconsistency between 95 Percent's stated reason for the issuance of the PIP—that Ms. Joyner's "conduct ha[d] proved disruptive to other employees and the functioning of the Company"—and its acknowledgement in the very same document of her strong quantitative performance is the type of contradictory feedback that suggests the adverse action would not have occurred but for the protected activity. *See* (ECF No. 1-2 ¶ 58). Thus, Ms. Joyner has sufficiently alleged causation as to her claim of retaliation, and Defendant's Motion (ECF No. 10) is DENIED as to Count II.

### CONCLUSION

For the reasons stated above, Defendant's Partial Motion to Dismiss (ECF No. 10) is GRANTED IN PART and DENIED IN PART. Specifically, Defendant's Motion is GRANTED as to Count I to the extent that claim relies on a theory of constructive discharge. To the extent Count I is based on a theory of constructive discharge, it is DISMISSED. Count I remains pending, however, to the extent it alleges discrimination based on hostile work environment.[16] Defendant's Motion is DENIED as to the retaliation claim in Count II, which remains pending.

A separate Order follows.

Date: July 24th, 2026

/s/
_____
Richard D. Bennett
United States Senior District Judge

---

[16] As explained above, Defendant did not challenge Count I to the extent it alleges hostile work environment.